**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

SHARON JONES and STEVE BAILEY,

                            Plaintiffs,

        -against-

EDWARD F. STANCIK, The Special Commissioner
of Investigation for the New York City School District,
in his official and individual capacities; REGINA A.
LOUGHRAN, Acting Special Commissioner of
Investigations for the New York City School District,
in her official and individual capacities; THE
OFFICE OF THE SPECIAL COMMISSIONER
OF INVESTIGATION FOR THE NEW YORK
CITY SCHOOL DISTRICT; HAROLD O. LEVY,
Chancellor of the New York City Board of Education,
in his official and individual capacities; RUDOLPH
CREW, former Chancellor of the New York City
Board of Education, in his official and individual
capacities; CHAD VIGNOLA, Chief Counsel,
Office of Legal Services of the New York City Board of
Education, in his official and individual capacities;
RICHARD ORGANISCIAK, Superintendent of the
Office for Alternative, Adult and Educational Schools
and Programs for the New York City Board of
Education, in his official capacity; THE NEW YORK
CITY BOARD OF EDUCATION; NINFA SEGARRA,
Member of the New York City Board of Education,
in her official and individual capacities; SANDRA E.
LERNER, Member of the New York City Board of
Education, in her official and individual
capacities; JERRY CAMMARATA, Member
of the New York City Board of Education, in his official
and individual capacities; TERRI THOMSON,
Member of the New York City Board of Education,
in her official and individual capacities;
CAROL GRESSER, former Member of the New York
City Board of Education, in her official and
individual capacities; IRVING S. HAMER,
JR., Member of the New York City Board of
Education, in his official and individual capacities;
and WILLIAM C. THOMSON, JR., former
Member of the New York City Board of Education,
in his official and individual capacities,

                            Defendants.

-----------------------------------------------------------------

Docket No.

**CV 02 4541**

**COMPLAINT**

**JURY TRIAL DEMANDED**

JOHNSON, J.

POLLAK, M.J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
AUG 16 2002
BROOKLYN OFFICE

Plaintiffs **SHARON JONES** and **STEVE BAILEY**, by their attorneys, Shebitz Berman & Cohen, P.C., for their complaint against defendants alleges as follows:

## PRELIMINARY STATEMENT

1.      Sharon Jones is a 27-year employee of the New York City Board of Education who has served with distinction as a teacher and administrator. Her career and reputation were damaged, however, when Edward F. Stancik and the Office of the Special Commissioner of Investigation publicly disseminated a false and ill-conceived report accusing Ms. Jones of fraudulently inflating attendance and enrollment figures at the Rikers Island Educational Facility ("RIEF"), at which she was principal. The injury to Ms. Jones was compounded by the New York City Board of Education and the individual defendants who comprise the Board of the New York City Board of Education, who, after investigating the allegations by Stancik and his office, determined that his conclusions were flawed and poorly investigated, and determined that no grounds existed for charging Ms. Jones with wrongdoing. In spite of that conclusion, the Board, in conjunction with the Individual Board Members employees named above, did bring charges against Ms. Jones on exactly the same grounds as alleged by Stancik and his office – knowing that they were without any merit and could not be supported by the evidence.

2.      The Board defendants insisted on forcing Ms. Jones to a hearing on the charges – at which they announced their intention to seek to terminate her employment. After the Board defendants dragged Ms. Jones through 10 days of hearings – during which the Board failed to present any inculpatory evidence - the Hearing Officer exonerated Ms. Jones of all the charges. Ms. Jones and her husband Steve Bailey have both been injured by the inexcusable actions of the defendants for which they now seek compensation.

3.      Ms. Jones continues to be harmed by defendants through the continued public dissemination of the false and ill-conceived report and its accompanying press release.

1

## THE PARTIES

4.     Plaintiff Sharon Jones is a tenured Principal employed by the New York City Board of Education and is, and has been at all relevant times, a resident of Kings County, New York.

5.     Plaintiff Steve Bailey is the spouse of plaintiff Sharon Jones and is, and has been at all relevant times, a resident of Kings County, New York.

6.     Defendant Edward F. Stancik ("Stancik") was, at all relevant times, The Special Commissioner of Investigation for the New York City School District, an office created by Executive Order of the Mayor of the City of New York. Stancik died on or about March 2002. He is sued in his official capacity and his individual capacity through his estate.

7.     Regina A. Loughran was the Acting Special Commissioner of Investigations for the New York City School District and previously was the First Deputy Commissioner, in her official and individual capacities.

8.     Defendant The Office of the Special Commissioner of Investigation for the New York City School District ("SCI") was, until Stancik's death, at all relevant times under the direction of defendant Stancik, as of the date of the filing of this Complaint, a new permanent replacement for Stancik has not been announced. SCI is charged with the responsibility, *inter alia*, of investigating allegations of wrongdoing within the New York City Board of Education. In doing so, SCI owes a duty of care to the New York City Board of Education, its employees and the public at large to conduct its investigations thoroughly and appropriately and to make any conclusions only after having done so and having established with a degree of certainty that such wrongdoing is supported by credible evidence.

9.     Defendant Harold O. Levy is the Chancellor of the New York City Board of Education and the chief executive officer for the city school district, including RIEF. His duties and responsibilities are set forth in New York's Education Law, Article 52-A and include, *inter alia*, the responsibility to recommend to the Board of Education the whether charges should be

2

brought against tenured administrators, such as Ms. Jones, only when probable cause exists for such charges. He is sued in his official and individual capacities.

10.     Defendant Rudolph Crew ("Crew") is the former Chancellor of the New York City Board of Education and was, at the time disciplinary charges were brought against Ms. Jones, pursuant to New York's Education Law § 3020-a, the chief executive officer for the city district including RIEF. He was under an obligation, as a matter of law, to recommend charges against tenured administrators, such as Ms. Jones, only when probable cause existed for such charges. He is sued in his official and individual capacities.

11.     Defendant Chad Vignola ("Vignola"), is, and was at all relevant times, the Chief Counsel in the Office of Legal Services of the New York City Board of Education. As such, he (a) is under a duty as an officer of the Courts, and as an senior and confidential employee of the Board of Education, and (b) has a fiduciary responsibility to the employees of the Board of Education, *inter alia*, to recommend to the Chancellor that charges be brought against tenured administrators, such as Ms. Jones, only after thoroughly investigating the legitimacy of such charges and a proper determination that probable cause exists for bringing such charges. He is sued in his official and individual capacities He is sued in his official and individual capacities.

12.     Defendant Richard Organisciak ("Organisciak") is the Superintendent of the Office for Alternative, Adult and Educational Schools and Programs for the New York City Board of Education. As such, he is the direct supervisor of the Principal of RIEF. As such, he is under a duty to recommend to the Chancellor that charges be brought against tenured administrators under his jurisdiction only where probable cause exists for such charges. He is sued in his official capacity.

13.     Defendant The New York City Board of Education ("City Board") and its individual current members, Ninfa Segarra, Sandra E. Lerner, Jerry Cammarata, Terri Thomson, Irving S. Hamer, Jr. and former individual members Carol Gresser and William C. Thompson, Jr. (the current and former individual members, collectively as the "Individual Board Members")

3

(the City Board and the Individual Board Members are collectively referred to as the "Board"), are charged by law, pursuant to New York's Education Law § 52-a with the responsibility, *inter alia*, as an employer of all New York City Board of Education employees, including plaintiff Sharon Jones and defendants Vignola, Crew and Levy. The City Board and the Individual Board Members are further charged by law, pursuant to Education Law § 3020-a with the responsibility to determine, by a vote of a majority of all the members of the Board, whether probable cause exists to bring a disciplinary proceeding against a tenured employee, such as plaintiff Jones. Defendants have a fiduciary duty to make such a determination only after considering all credible evidence in support of, and against the bringing of charges.  The Individual Board Members defendants, both current and former, are sued in their individual and official capacities.

## JURISDICTION AND VENUE

14.     Jurisdiction against each of the defendants is founded on 28 U.S.C § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 1983, and principles of supplemental jurisdiction as codified in 28 U.S.C. § 1367.

15.     Venue in this judicial district is proper by virtue of 28 U.S.C. § 1391(b) because, defendants Levy, Vignola, and the Board maintain their principal offices within the district.

## FACTS

16.     Plaintiff, Sharon Jones, is a tenured educator and administrator who has been an employee of the City Board for more than 27 years.

17.     From 1983 until the fall of 1999, she was an administrator at the Rikers Island Correctional Facility ("RIEF"), first as an Assistant Principal and then as the Principal.

18.     RIEF is one of four schools located on Rikers Island serving inmates and detainees of the New York City Department of Corrections ("DOC").  As a correctional facility Rikers Island is under the control of the DOC.

19.     However, REIF is a school maintained and funded by the Board defendants and run by Board employees.  REIF is, first and foremost, an educational facility.

4

20.     RIEF has unique issues regarding facilities, security, enrollment and attendance that do not exist in most other schools in New York City. Historically, RIEF has an extraordinary turnover of students since its students may be released, transferred to other correctional facilities, attending trial, and/or are re-located to housing within Rikers Island that has no access to RIEF.

21.     Additionally, there is an extraordinary absenteeism rate because on any given day, students may be in Court, in the hospital, temporarily transferred to protective or segregated housing with no access to the school, and/or because they refuse to attend school.

22.     During the period 1996-97 and 1997-98 school years (the "relevant time period"), DOC required students to check in daily upon entering the school area. Inmate students often give false identities, aliases, dates of birth and addresses, making accurate attendance taking and tracking of students even more difficult.

23.     RIEF's attendance record keeping was hindered because it was without an attendance teacher for several years, including the relevant time period. An attendance teacher checks student attendance which, upon information and belief, was a decision made within the Board.

24.     During the relevant time period, communication from DOC to RIEF's administrators regarding the whereabouts and status of student inmates was so lacking that the teachers and administrators at the school often did not know if a student was absent for an extended period of time because the student-inmate had been discharged from Rikers Island or remained on the island but not attending school for one reason or another.

25.     During the relevant time period, pursuant to Board policy applicable to all New York City public schools, a student could not be discharged from a school's register until he or she has been absent for at least 20 consecutive days and appropriate follow-up and investigation concerning the student's whereabouts can be documented.

26.     Even if a student had been absent for the minimum 20 consecutive days, according to applicable policies during the relevant time period, only an attendance teacher had the authority

5

to officially discharge or remove a RIEF student from the enrollment lists of a school, and then only after an investigation was completed in which it was finally determined that the student was actually attending another school.

27.     At RIEF, the lack of an attendance teacher, poor communication from DOC about the whereabouts of student-inmates and the failure of student-inmates to provide accurate information prevented staff and administration at RIEF from being able to officially discharge or remove student-inmates from RIEF's enrollment records in accordance with existing Board regulations and policies.

28.     The result was that students often remained on RIEF's enrollment records for long periods of time after they no longer attended the school – not because of any wrongdoing by RIEF's staff or administration – but because of the requirements of existing Board regulations and policy.

29.     New York City's public schools are designated as either "formula schools" or, more rarely, "needs assessment schools".

30.     In most public schools, called "formula schools", the amount of money budgeted for a school is based upon its enrollment and attendance figures as provided by the school's administration.

31.     During the relevant time period, in recognition of the unique difficulties in keeping accurate enrollment and attendance records, schools such as RIEF, and a small number of other public schools, were designated as "needs assessment schools".

32.     In RIEF, as in other needs assessment schools, the school's budget is not based on enrollment and attendance. Instead, RIEF's budget is based on a negotiated process involving the school's Principal and Board of Education officials.  As the defendants were well aware, RIEF's budget is deliberately not based upon enrollment and attendance.

33.     Until the actions of the defendants at issue in this suit, Ms. Jones' employment record was unblemished. Indeed, she had been cited for excellence in the performance of her duties.

34.     Then, in June, 1999, defendant SCI, under defendant Edward F. Stancik, released an

enormously flawed-page report, which carried the headline-grabbing title: "Jailhouse Math: An Investigation into the Inflation of Enrollment at Rikers Island Educational Facility" ("Jailhouse Math").

35.    Stancik and SCI released Jailhouse Math in a very public way, starting with a press release dated June 30, 1999 (the "Press Release") and a press conference for live and wire reporters for both network and print media. The false information was covered by, *inter alia,* the New York Post and the New York Daily News and television and radio stations. Upon information and belief, Stancik made false and defamatory statements against Ms. Jones.

36.    Jailhouse Math and the Press Release for Jailhouse Math continue to be publicly disseminated by SCI, defendant Loughran, and prior to his death, by defendant Stancik.

37.    In Jailhouse Math, SCI and Stancik falsely concluded that Principal Jones fraudulently "vastly inflated" enrollment at RIEF in order to "receive[] substantially more resources that the school was entitled to".

38.    In the report, defendants SCI and Stancik further stated that "Principal Jones pressured and threatened teachers into maintaining former inmates on their class registers and refused to let teachers discharge students who had long since been released from Rikers."

39.    SCI and Stancik also stated, "[b]y padding her school's numbers, Jones was able to obtain more teachers and staff than the school was legitimately entitled to...Therefore, Jones's abuse of the process was not only dishonest, but decreased the resources available to other schools." SCI and Stancik stated, "the staff position in charge of such duties [attendance] was left vacant," suggesting that Ms. Jones deliberately engaged in illegal actions.

40.    To the contrary, the vacancy in the attendance position had nothing to do with Principal Jones.  It was the result of either a union grievance or an executive decision of her supervisor – the Superintendent of Alternative Schools defendant Organisciak.

41.    Defendants Stancik and SCI then recommended that her employment "be terminated and that her misconduct be considered should she re-apply for employment with the BOE in any

capacity, including as a consultant."

42.     The statements contained in Jailhouse Math and its Press Release, and made public by Stancik, Loughran and SCI were made pursuant to the official policy, rules, practice and custom of SCI and Stancik and during the course of and in the scope of defendants' official employment.

43.     The existence of such policy and practice, to disseminate stigmatizing reports about Board employees, including plaintiff, without making appropriate factual determinations and ignoring exculpatory facts and circumstances, is detrimental to the public at large because it undermines the integrity of and the confidence in body appointed to conduct investigations.

44.     To the extent the dissemination of the allegations in Jailhouse Math by Stancik, Loughran and SCI were not made pursuant to official policy, rules, practice and custom of defendants, but were random or in flagrant violation of established SCI rules, then there is no adequate post-deprivation remedy available to Ms. Jones except for the personal liability of Stancik and Loughran.

45.     Immediately upon receiving Jailhouse Math, high-level administrators within the Board including at least Harrington and Organisciak conducted their own investigations into the vicious and devastating allegations and conclusions in the report.  Their investigation included review of applicable Board regulations and policies.

46.     These regulations and policies, apparently ignored by Stancik and his office, described the budget process applicable to RIEF, including its designation as a needs assessment school and the methods by which students could be officially discharged from the enrollment records of a public school, including RIEF.

47.     Defendants Stancik and SCI knew or should have known that the enrollment and attendance figures at RIEF had no effect on how much money the school received or how many teachers and staff members it would have.

48.     Thus, one entire premise of Jailhouse Math – that Principal Jones inflated enrollment so that she could get more money for the school – is entirely false.

49.     Additionally, pursuant to Board regulations in effect during the relevant time period, only an attendance teacher can "discharge" a student from the enrollment register of any Board school and then, only after determining, following an investigation, that each individual student has been re-enrolled in, and is attending, another school.

50.     The policies and regulations that limit discharges of students to the method described above were public documents available to Stancik and SCI during their investigation. Defendants Stancik and SCI knew or should have known that Principal Jones had no authority to remove students from the enrollment register of RIEF.

51.     Thus, another of defendants SCI and Stancik's conclusions - that Ms. Jones deliberately kept students on the register who should have been discharged - is also false.

52.     After reviewing applicable and available regulations and policies, defendants Harrington and Organisciak, in separate reports to Board officials, including but not limited to defendant Vignola in the Office of Legal Services, concluded that there was "no basis" for bringing charges against Principal Jones or seeking her termination.

53.     In his report, defendant Organisciak described Stancik's investigation as "flawed", noting "our [Board] discharge practices do not permit us to remove students from register until a minimum of twenty consecutive days of absences has occurred and appropriate follow-up and investigation can be documented." (Emphasis in original).

54.     Margaret Harrington, then Chief Executive for School Programs and Support Services at the Board, and defendant Organisciak's immediate supervisor, also issued a report after investigating Stancik and SCI's public accusations against Principal Jones.

55.     In her report, Dr. Harrington also detailed the flaws in Stancik and SCI's report concerning budget allocations, demonstrating that RIEF received fewer resources than it would have if the formula method applied.

56.     Dr. Harrington specifically recommended against bringing charges against Principal Jones stating that "the data did not support charges for the Principal". This recommendation

9

followed a Technical Assistance Conference which, pursuant to Board policy, was designed to review allegations and guard against meritless charges against educators and administrators like Ms. Jones.

57.     Subsequently, the Board defendants sought to avoid any disclosure of the Organisciak and Harrington reports that exculpated Ms. Jones of the charges brought against her.

58.     In September 1999 - which was prior to the commencement of any charges against Ms. Jones, or any notice to her of any pending charges, and subsequent to the investigation performed by defendant Organisciak and Dr. Harrington that cleared Ms. Jones - Department of Corrections officers appeared at Principal Jones' office at RIEF and demanded that she leave Rikers Island immediately.  Ms. Jones was publicly removed from Rikers Island, in front of her staff, by the Warden, a security officer and two corrections officers.  Ms. Jones was given no reason for this precipitous action that harmed her career and her reputation.

59.     Outrageously, and without any justification whatsoever, defendant Vignola recommended that charges against Principal Jones be instituted by the then-chancellor, Rudolph Crew, for "fraudulently" inflating enrollment and attendance figures in an effort to get more money for RIEF and for allegedly threatening teachers in the school not to remove students from their register except for certain times of the year.  This was contrary to the results of Organisciak's and Harrington's investigation and review.

60.     In spite of uncontroverted, overwhelming evidence in the Board defendants' possession, custody or control that the charges were baseless, and, upon information and belief, on the recommendation of defendant Vignola, Individual Board Members and the City Board, and defendant Rudolph Crew sought the institution of charges.

61.     Defendant City Board through the votes of the Individual Board Members and without any investigation, justification or legal basis whatsoever, voted to charge Principal Jones with four separate specifications of misconduct and sought to terminate her employment.

62.     Upon information and belief, the decision to bring administrative charges against

Ms. Jones and to terminate her employment with the Board was the result of deliberate scheme, plan and conspiracy among the Individual Board Members who knew or should have known that probable cause for the charges did not exist but, acting with malice, deliberately attempted to deprive plaintiff Jones of her employment and smear her good name and reputation in reckless disregard for the truth or falsity of the issue.

63.     Upon information and belief, the bringing of charges against Ms. Jones, without an appropriate determination that probable cause existed to support the charges, is in itself a policy and practice within the Board and its Office of Legal Services.   The existence of such a policy and practice is harmful to Ms. Jones as well as to all employees within the Board and to the public at large because it undermines the integrity of the system and the confidence that the public should be able to have in it.

## A Complete Lack of Evidence at the Hearing to Support the Charges

64.     Hearings on the charges were held before a single hearing officer.   Twenty-five witnesses testified over 10 days and the hearing transcript is over 1394 pages.   Despite the length and volume of the hearings, the testimony and documentary evidence did not support the Board's charges against Ms. Jones.

65.     On August 29, 2000 and December 9, 2000, Edward Miller, the chief investigator for Stancik and the SCI, testified that the witnesses he interviewed and the facts he uncovered during his investigation did not support the charges brought against Ms. Jones.

66.     On December 5, 2000, Elvin Ames, a math teacher at RIEF, testified that Ms. Jones never told him to mark students present when they were absent (Tr 434).[1]

67.     On December 5, 2000, Jane Lopez-Perez, an English teacher at RIEF, testified that Ms. Jones never told her to mark children absent when they were absent (Tr 450).

68.     On December 5, 200, James Pitts, a math teacher at RIEF, testified that Ms. Jones never told him to mark students present who were not in his class (Tr 477).

---

[1] "Tr" refers to the transcript from the administrative hearing below.

11

69.     On December 6, 2000, Karen Steele, an English teacher at RIEF, testified that Ms. Jones never told her to falsify attendance records (Tr 519).

70.     On December 6, 2000, Erik Jenkins, a math and career education teacher at RIEF, testified that Ms. Jones never asked him to mark children absent or present if they were not present or absent (Tr 559).  Mr. Jenkins further testified that he told SCI and Stancik's office that he was unaware of any fraudulent or illegal acts by Jones (Tr 560).

71.     On December 6, 2000, Elron Vieira, a special education teacher at RIEF, testified that Ms. Jones never told her to falsify attendance records (Tr 569).

72.     On December 6, 2000, Jim Cocoros, an English teacher at RIEF, testified that Ms. Jones never told him to falsify records (Tr 712).

73.     On December 6, 2000, Jim Nemopoulos, a social studies teacher at RIEF, testified that he was never threatened by Ms. Jones or directed by her to alter records (Tr 767).

74.     On January 4, 2001, Enrique Alberto, a former attendance teacher at RIEF who left in 1995, testified that as the attendance teacher he was the only person who could process a "not found" discharge (Tr 801).  Mr. Alberto further testified that Ms. Jones never told him to falsify information (Tr 802).

75.     On January 4, 2001, Michael Cockrell, the attendance teacher at RIEF from on or about 1997 to 1998, testified that there was no attendance teacher at RIEF when he arrived in 1997 and that Ms. Jones never told him to falsify documents or threatened him (Tr 808, 837).  In fact, he stated that Ms. Jones congratulated him for closing out the "407s", which were the forms used to determine whether students were still in jail, discharged, sent to another facility or sent home (Tr 808, 830).

76.     On January 5, 2001, Neil Harwayne, the Deputy Superintendent of Operation for the Board from 1997 through 1998, testified that RIEF, as a needs assessment school, does not fit the usual formula of funding, which is based on the number of children registered at the school (Tr 846).  Mr. Harwayne further testified that the RIEF principal would come to his office and

12

discuss the school's needs in order to formulate the budgetary allocation (Tr 848).  However, Mr. Harwayne testified that funds not used by RIEF, which RIEF often had, did not benefit RIEF and instead were returned and used by the High Schools Division for use by all schools (Tr 855). According to Mr. Harwayne's testimony, in the 1996-1997 school year, Jones asked for less money than the amount she was given by the Board (Tr 880).  To Mr. Harwayne's knowledge, Ms. Jones did not benefit from the extra money at RIEF (Tr 898).

77.     On January 5, 2001, Neil Bluth, the Director of the Office of Instructional Program Management for the Board from 1997-1998, testified that SCI and Stancik's office understood that RIEF's budgetary allocation was not based on a register estimate of the number of students at RIEF (Tr 923-924).

78.     On January 31, 2001, Esteban Colon, the Director of Education for the NYC Department of Corrections, testified that RIEF did not get more fiscal resources than it was entitled from 1996 to 1998 (Tr 1036).  Mr. Colon further testified that during his work with Ms. Jones from 1996 through 1998, he did not find any evidence that Ms. Jones had been falsifying documents.

79.     On January 31, 2001, defendant Organisciak testified about the Board's internal investigation regarding the charges brought against Ms. Jones.  Mr. Organisciak testified that he did not conclude that Ms. Jones was guilty of any fraudulent practices and that he had no evidence that Ms. Jones threatened anyone to falsify records or not discharge students (Tr 1071-1073).  Mr. Organisciak further testified that RIEF did not use its full allocation of resources and regularly turned back resources (Tr 1072).  Mr. Organisciak further testified that he agreed with conclusion in Dr. Harrington's report that stated that the Technical Assistance Conference felt the data did not support charges against Ms. Jones (Tr 1080-1081).  Mr. Organisciak further testified that RIEF was a needs assessment school, whose funding was not driven by attendance but rather by the specific needs of the school (Tr 1106-1108).

80.     Mr. Organisciak continued his testimony on February 1, 2001.  Mr. Organisciak

13

testified that it became apparent to him when being questioned by investigators from SCI and Stancik's office that

> there was an alarming lack of knowledge evident to me by the questions that were asked" and "then to have the [SCI and Stancik] report literally two or three weeks thereafter, it disturbed me greatly that what I considered to be their lack of knowledge found its way to be reflected in the document....there were flaws, that there was in fact ignorance attached to their interpretations.... (Tr 1165).

81.     Mr. Organisciak further testified on February 1, 2001 that he, and to his knowledge no one else at the Board, had no prior knowledge that the NYC Department of Corrections was going to escort Ms. Jones off of Rikers Island (Tr 1168-1169). He testified that he thought her removal was inappropriate and it put Ms. Jones in a rather embarrassing position by creating a rather unceremonious exit (Tr 1170-1171). Mr. Organisciak supported her line of duty injury that resulted from her treatment (Tr 1173).

82.     Mr. Organisciak continued his testimony on February 2, 2001 and testified that, in his opinion, the allegations of impropriety against Ms. Jones were unfounded (Tr 1295-1296). Mr. Organisciak further testified that Mr. Vignola investigated the charges against Ms. Jones (Tr 1326-1327).

83.     On February 1, 2001, Stephen Phillips, Ms. Jones' prior supervisor and the Superintendent for Alternative, Adult and Continuing Education Programs prior to Mr. Organisciak, testified that the accusation that Ms. Jones fraudulently inflated enrollment at RIEF to increase allocation of resources to RIEF was "absurd." (Tr 1186). Mr. Phillips testified that Ms. Jones' job performance was "exemplary," "marvelous," and "outstanding." (Tr 1178).

84.     On February 2, 2001, Dr. Harrington, who was the Chief Executive for School Programs and Student Support Services from March 1997 to October 1999 and defendant Organisciak's supervisor, testified that she did not feel there was any attempt by Ms. Jones to defraud the Board and that she disagreed with the conclusions in Jailhouse Math (Tr 1230-1231). Dr. Harrington further testified that SCI and Stancik's office did not understand how a needs

assessment school worked and that she relayed this information to SCI and Stancik's office prior to the issuance of Jailhouse Math (Tr 1235-1238). Dr. Harrington further testified that the decision from the Technical Advisory Conference, which she attended, was that no charges would be brought against Ms. Jones (Tr 1248-1250).

85.     On February 2, 2001, Dan Carponcy, Director of Special Projects within the Board, testified that his role was to verify the accuracy of records (Tr 1277). Mr. Carponcy testified that his office had performed regular audits of the attendance register at RIEF prior to Jailhouse Math and found no irregularities, fraud or misrepresentation (Tr 1285).

86.     On February 2, 2001, Frank Dody, the principal at RIEF upon Ms. Jones' removal, testified that many of the problems of enrollment, attendance and discharge continued to exist as when he arrived at RIEF, and apart from an additional resource being provided, he acknowledged doing "nothing" different from when Ms. Jones was principal at RIEF (Tr 1355-1358).

## The Decision Vindicating Ms. Jones

87.     At the conclusion of the evidence and following argument by counsel for the parties, in a written decision, the hearing officer found Principal Jones "not guilty" of each of the four charges.

88.     Concerning the first charge against Ms. Jones, the Hearing Officer concluded, *inter alia*, that

> there was a complete absence of evidence to indicate that Respondent in any way fraudulently increased the school's reported enrollment...and there was no evidence that the school received increased resources in excess of what it was legitimately entitled to, inasmuch as under the classification of RIEF being a needs assessment school, it was almost oxymoronic to charge that the increasing of the school's reported enrollment would result in the school receiving increased resources in excess of what it was legitimately entitled to. Additionally, the overwhelming, if not complete, tenor of the evidence was that under the procedures and – policies in place, Respondent was quite responsible in how she handled the application for resources for RIEF.

15

89.    On the second charge against Ms. Jones, the Hearing Officer concluded, *inter alia*,

> there was virtually a complete absence of proof that Respondent at any time during the pertinent years while Principal at RIEF threatened her staff in any way. To the contrary, it again appears that, except for two instances here teachers at RIEF made vague assertions that they heard Respondent assert if enrollment were not kept up, or the like, jobs would be lost, overwhelmingly the evidence demonstrated that Respondent was not guilty of any kind of threats against her staff.

90.    On the third charge, the Hearing Officer concluded, *inter alia*, that there

> is virtually a complete absence of proof that Respondent in any way prohibited her staff from removing former students from the school register. In going over the transcript of evidence and documents, I could find no credible or probative proof that indicated Respondent acted to prohibit staff from removing former students from the school register nor in any way directing the classification of these students as if they were still enrolled at the school. In this Specification, as in the others, there is an assertion or allegation, if you will, that Respondent actively engaged in misconduct as in this Specification prohibiting her staff from performing certain duties. The evidence in support of these allegations is not found.

91.    On the fourth and final charge against Ms. Jones, the Hearing Officer concluded that Ms. Jones was not guilty of the charge, finding, as in the other charges, an absence of any evidence that Ms. Jones was guilty "in any way of misconduct" with respect to the procedures used with students upon their release from RIEF.

92.    The Hearing Officer discussed the imposition of sanctions against defendant Board for frivolous charges against Ms. Jones. He stated, "it was clear to me, that much of the proof adduced here was in fact exculpatory rather than inculpatory. That is so to the degree that even witnesses called by the Board were less than accusatory of any misconduct by Respondent."

93.    The Board defendants did not appeal the Hearing Officer's decision.

94.    The public dissemination of "Jailhouse Math" and the imposition of charges by the Board against her and the specter of having to defend against them was emotionally and physically debilitating for Ms. Jones, requiring her to take a medical leave beginning in September 1999 through September 2000.

95.     Since that time, Ms. Jones has been on administrative assignment in the Office of the Superintendent of Alternative High Schools.

96.     Upon information and belief, Ms. Jones' name was placed on a "blacklist" at the Board effectively precluding her from any other employment within the Board.

97.     Plaintiffs filed a Notice of Claim more than 30 days prior to the filing of the Complaint.

98.     Upon information and belief, defendants SCI and Board have no written policy regarding the independent verification of factual and legal allegation prior to the creation and dissemination of any public report and press release.

99.     Upon information and belief, defendant SCI, Loughran and Stancik (when he was alive) have no written policy regarding guidelines, rules, regulations, codes, policies and/or procedures that govern how the SCI conducts and proceeds with investigations either originating in or referred to the SCI.

100.    Upon information and belief, defendant Board has no written policy regarding the establishment of probable cause for the preferral of charges against tenured teachers and administrators.

## AND AS FOR A FIRST CAUSE OF ACTION
(against defendants Stancik and SCI for depriving plaintiff of her constitutionally guaranteed liberty rights in violation of 42 U.S.C. § 1983)

101.    Plaintiff repeats and realleges paragraphs 1 through 100 as though each were fully set forth anew herein.

102.    Defendants Stancik and SCI, Crew, Levy, Vignola, Organisciak, Segarra, Lerner, Cammarata, Thomson, Gresser, Hamer and Thompson are state actors who acted under color of law concerning the allegations above, for purposes of claims brought under 42 U.S.C. § 1983.

103.    The purpose of claims under 42 U.S.C. § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights, and where such deprivations take place, to provide relief to such individuals.

17

104.    Plaintiff has a liberty interest in her good name and reputation guaranteed by the 5th and 14th Amendments to the United States Constitution.

105.    The public allegations made by Stancik and SCI in the report "Jailhouse Math: An Investigation into the Inflation of Enrollment at Rikers Island Educational Facility" maliciously accused Ms. Jones of criminal and unprofessional conduct including fraud and recommended termination of her employment and foreclosure of future employment, liberty interests guaranteed to Ms. Jones by virtue of the United States and New York State Constitutions and by federal and state law.

106.    The stigmatizing allegations of criminal and unprofessional conduct were untrue.

107.    Defendants knew or should have known the allegations were untrue.

108.    The allegations had the capacity of seriously damaging Ms. Jones's standing and associations in the community both professionally and personally as well as imposing on her a stigma or other disability that could foreclose her employment opportunities. This constitutes a tangible burden on her future employment prospects.

109.    Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

110.    By reason of defendants' actions, plaintiff Jones has been injured and has suffered physical and emotional injuries and disabilities.

## AND AS FOR A SECOND CAUSE OF ACTION
Crew, Levy, Vignola, Organisciak, New York City Board of Education, Segarra, Lerner, Cammarata, Thomson, Gresser, Hamer and Thompson for depriving plaintiff of her constitutionally guaranteed liberty rights in violation of 42 U.S.C. § 1983)

111.    Plaintiff repeats and realleges paragraphs 1 through 110 as though each were fully set forth anew herein.

112.    Defendants Crew, Levy, Vignola, Organisciak, Segarra, Lerner, Cammarata, Thomson, Gresser, Hamer and Thompson are state actors who acted under color of law concerning the allegations above, for purposes of claims brought under 42 U.S.C. § 1983.

113.    The purpose of claims under 42 U.S.C. § 1983 is to deter state actors from using the

18

badge of their authority to deprive individuals of their federally guaranteed rights, and where such deprivations take place, to provide relief to such individuals.

114.     Plaintiff has a liberty interest in her good name and reputation guaranteed by the 5th and 14th Amendments of the United States Constitution.

115.     The public allegations made by the Board defendants in the charges brought against Ms. Jones pursuant to Education Law § 3020-a maliciously accused Ms. Jones of criminal and unprofessional conduct including fraud and sought termination of her employment.

116.     The stigmatizing allegations of criminal and unprofessional conduct were untrue.

117.     Defendants knew or should have known the allegations were untrue.

118.     The allegations had the capacity of seriously damaging Ms. Jones's standing and associations in the community both professionally and personally as well as imposing on her a stigma or other disability that could foreclose her employment opportunities. This constitutes a tangible burden on her future employment prospects.

119.     Further, once the charges were brought and the hearing begun and none of the Board's witnesses provided any inculpatory evidence against Ms. Jones, the Board defendants should have abandoned their scheme to obtain the termination of Ms. Jones' employment. However, the Board defendants failed to do so.

120.     Defendants acted maliciously by failing to abandon their prosecution and the active deprivation of plaintiff's liberty interests in her good name, reputation and career even when it was inescapable that they could not succeed in their stated mission.

121.     Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

### AND AS FOR A THIRD CAUSE OF ACTION
(against defendants Stancik, SCI, Crew, Levy, Vignola, Organisciak, New York City Board of Education, Segarra, Lerner, Cammarata, Thomson, Gresser, Hamer and Thompson for commission of a Constitutional Tort under N.Y. Law)

122.     Plaintiff repeats and realleges paragraphs 1 through 121 as though each were fully set forth anew herein.

123.    Defendants, as state actors, acting under color of state law or custom, had a duty to protect Ms. Jones' liberty interests and a responsibility to avoid damaging her good name and reputation except where probable cause existed, following a thorough and proper investigation into suspicions of alleged  wrongdoing by her.

124.    Defendants knew or should have known the allegations were untrue.

125.    Defendants failed to fulfill those duties, thus causing damage to plaintiff's good name and reputation and future employment opportunities without probable cause.

126.    Further, once the charges were brought and the hearing begun, when none of the Board's witnesses provided any inculpatory evidence against Ms. Jones, the Board defendants should have abandoned their scheme to obtain the termination of Ms. Jones' employment.

127.    Defendants maliciously failed to abandon their prosecution and the active deprivation of her liberty interests to her good name, reputation and career even when it was inescapable that they could not succeed in their stated mission.

128.    Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

### AND AS FOR A FOURTH CAUSE OF ACTION
(against Stancik, Loughran and SCI for defamation)

129.    Plaintiff repeats and realleges paragraphs 1 through 128 as though each were fully set forth anew herein.

130.    Defendants Stancik and SCI made a number of specific allegations of criminality and professional misconduct and wrongdoing by Principal Jones in the report called "Jailhouse Math: An Investigation into the Inflation of Enrollment at Rikers Island Educational Facility".

131.    Some of those false and defamatory allegations were that plaintiff Jones "pressured and threatened teachers into maintaining former inmates on their class registers and refused to let teachers discharge students who had long since been released from Rikers"; "[b]y padding her school's numbers, Jones was able to obtain more teachers and staff than the school was legitimately entitled to"; "Jones's abuse of the process was not only dishonest, but decreased the resources

20

available to other schools"; "Jones and members of her administration orchestrated the inflation of the school's enrollment"; "[t]he inflated enrollment at RIEF was the product of a methodical and determined effort by Principal Jones to keep former students on the school register"; [w]hile Jones did little to ensure that former inmates entered a new school, she was eager to use them to inflate the resources her school received"; "[t]he obvious idea behind this inflation was to obtain more resources for the school and to avoid losing staff should the budget be cut"; "Principal Jones prevented her teachers from removing these former students' names from the school register, and threatened that if the enrollment declined teachers would be fired"; and "[t]olerating Jones's actions will encourage dishonest principals to manipulate statistics".

132.    By the Press Release, Stancik, Loughran and SCI committed further defamatory acts.  This includes:

a)    "repeatedly inflated her school register and prevented her staff from discharging former students, apparently in order to secure more resources for school."

b)    "The report focuses on the spring 1997 semester and the 1997-98 school year and exposes the following malfeasance [of Ms. Jones]"

c)    "Reported enrollment in 1997 was more than double the true enrollment at RIEF."

d)    "For example, in the fall of 1997 RIEF's reported enrollment of 1,688 students was more than 900 higher than the true enrollment.  The vast majority of these students had apparently been released from Rikers, but were retained on the school's rolls nonetheless."

e)    "Jones prohibited her staff from removing the names of former students from the school register and threatened teachers that they would lost their jobs if the school's enrollment declined."

f)    "Jones inflated the school's enrollment by hundreds of students when submitting budget requests, and as a result, RIEF received more resources than it was entitled to."

g)    "The report goes beyond Jones's misconduct…"

h)    "at the same time that Jones was inflating her school's enrollment, she made little or no effort to ensure that former students entered a new school upon being released from ricers Island…"

i)    "The Special Commissioner recommends that principal Sharon Jones's employment with the Board of Education be terminated.."

133.    Each of these statements is defamatory *per se* or is capable of defamatory meaning.

21

134.    Upon information and belief, Stancik made false and defamatory statements against Ms. Jones at a press conference on June 30, 1999.

135.    The defamatory statements were covered by, *inter alia,* the New York Post and the New York Daily News and television and radio stations.

136.    Each of these statements in the Jailhouse Math and the Press Release was made publicly.

137.    To date, these defamatory statements continue to be publicly disseminated, and upon information and belief, republished by defendants, despite the proven falsity of the charges against Ms. Jones and her complete exoneration.

138.    By reason of their intentional and malicious defamation of plaintiff, accusing her of criminality and professional wrongdoing, defendants sought to impact upon plaintiff's good name and reputation and for their conduct plaintiff Jones has been injured.

139.    Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

### AND AS FOR A FIFTH CAUSE OF ACTION
(against Crew, Levy, Vignola, Organisciak, New York City Board of
Education, Segarra, Lerner, Cammarata, Thomson, Gresser, Hamer
and Thompson for defamation)

140.    Plaintiff repeats and realleges paragraphs 1 through 139 as though each were fully set forth anew herein.

141.    The Board defendants' charges against plaintiff contained a number of specific allegations of criminality and professional misconduct and wrongdoing by Principal Jones.  Those charges included allegations that she "fraudulently increased the school's reported enrollment, and, as a result, the school receive increased resources in excess of what the school was legitimately entitled to and thereby decreased the resources available to other schools"; "regularly threatened her staff in that Respondent told staff that if they removed students' names from the register before certain times within a year, teachers would lose their jobs"; and "prohibited her staff from removing former students from the school register".

22

142.    Each of these statements is defamatory *per se* or is capable of defamatory meaning.

143.    Upon information and belief, each of these statements was made publicly and continues to be publicly disseminated to date.

144.    By reason of their intentional and malicious defamation of plaintiff, accusing her of criminality and professional wrongdoing, defendants sought to impact upon plaintiff's good name and reputation and for their conduct plaintiff Jones has been injured.

145.    Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

### AS AND FOR A SIXTH CAUSE OF ACTION
(against defendants Stancik and SCI for malicious prosecution)

146.    Plaintiff repeats and realleges paragraphs 1 through 145 as though each were fully set forth anew herein.

147.    Defendants Stancik and SCI function as investigators in that they are charged with the responsibility of investigating allegations of criminality within the Board and recommending discipline including, but not limited to termination and criminal prosecution. Moreover, Stancik and SCI expect their recommendations as to punishment to be followed, including termination of employment of Board employees investigated by them.

148.    Defendants Stancik and SCI charged plaintiff with criminal acts and recommended that her employment be terminated, but they did so without probable cause and having failed to make appropriate inquiries, as reasonable investigators would have done.

149.    Defendants Stancik and SCI's failure to properly investigate prior to announcing their false "findings" and encouraging the Board defendants to terminate plaintiff's employment were malicious.

150.    The prosecution of plaintiff based upon the allegations and conclusions in Jailhouse Math was resolved wholly in her favor.

151.    By reason of defendants' acts, plaintiff has been harmed.

152.    Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

## AND AS FOR A SEVENTH CAUSE OF ACTION
(against defendants Crew, Levy, Vignola, Organisciak, New York City Board of
Education, Segarra, Lerner, Cammarata, Thomson, Gresser, Hamer and Thompson malicious
prosecution)

153.   Plaintiff repeats and realleges paragraphs 1 through 152 as though each were fully set forth anew herein.

154.   The Board defendants charged that plaintiff "fraudulently increased the school's reported enrollment, and, as a result, the school received increased resources in excess of what the school was legitimately entitled to and thereby decreased the resources available to other schools"; "regularly threatened her staff in that Respondent told staff that if they removed students' names from the register before certain times within a year, teachers would lose their jobs"; and "prohibited her staff from removing former students from the school register".

155.   The Board defendants acted as prosecutors by bringing charges of criminality and misconduct against plaintiff in an effort to terminate her employment – each having a role in the process of preferring the charges or actually prosecuting the charges against her.

156.   The charges brought by the Board defendants against plaintiff were based upon the flawed investigation results by Stancik and SCI, which the Board defendants knew or should have known were flawed.

157.   The Board defendants failed to properly investigate the allegations and conclusions in Jailhouse Math or they ignored its flaws, having actual knowledge that the report was erroneous and flawed. Their prosecution of plaintiff was, therefore, malicious.

158.   The Board defendants' prosecution of plaintiff lacked probable cause.

159.   The Board defendants' prosecution of plaintiff was terminated wholly in favor of plaintiff.

160.   By reason of defendants' acts, plaintiff was harmed.

161.   Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

## AND AS FOR AN EIGHTH CAUSE OF ACTION

(against defendants Crew, Levy, Vignola, Organisciak, New York City Board of
Education, Segarra, Lerner, Cammarata, Thomson, Gresser, Hamer and Thompson for abuse of
process)

162.    Plaintiff repeats and realleges paragraphs 1 through 161 as though each were fully
set forth anew herein.

163.    The charges brought by the Board defendants against plaintiff and served upon her,
were brought solely to harass her, to obtain the termination of her employment and to harm her
without excuse or justification.

164.    By doing so, defendants harmed plaintiff.

165.    Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

## AND AS FOR A NINTH CAUSE OF ACTION

(against defendants Stancik and SCI for abuse of process)

166.    Plaintiff repeats and realleges paragraphs 1 through 165 as though each were fully
set forth anew herein.

167.    Defendants Stancik and SCI procured the initiation of charges by the Board
defendants against plaintiff, inducing them to prefer charges by publicly denouncing the Board
defendants for not immediately taking steps to terminate plaintiff's employment upon the
recommendation by Stancik and SCI to do so.

168.    By doing so, plaintiff was injured.

169.    Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

## AND AS FOR A TENTH CAUSE OF ACTION

(against defendants Stancik, Loughran and SCI for tortious interference with plaintiff's
contractual relations)

170.    Plaintiff repeats and realleges paragraphs 1 through 169 as those each were fully set
forth anew herein.

171.    Plaintiff has an existing contractual relationship by virtue of her employment with
the City Board.

25

172.    Defendants Stancik and SCI knowingly and intentionally interfered with that relationship by advocating for the termination of employment with the City Board.

173.    Defendants Stancik and SCI sought to interfere with plaintiff's employment relationship by failing to fully and appropriately investigate the allegations against plaintiff in that they knew or should have known that plaintiff did not commit the criminal and wrongful acts alleged by defendants Stancik and SCI.

174.    Defendants Stancik and SCI acted with the sole purpose of harming plaintiff's relationship with the Board.

175.    To date, Stancik, Loughran and SCI continue to interfere with plaintiff's employment relationship by knowingly and intentionally continuing to disseminate false information about plaintiff.

176.    By doing so, defendants Stancik, Loughran and SCI caused, and continue to cause, injury to plaintiff's employment relationship.

177.    Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

### AND AS FOR AN ELEVENTH CAUSE OF ACTION
(against defendants Stancik, Loughran and SCI for tortious interference with plaintiff's prospective economic advantage)

178.    Plaintiff repeats and realleges paragraphs 1 through 177 as though each were fully set forth anew herein.

179.    Plaintiff has an existing contractual relationship by virtue of her employment with the City Board.

180.    Defendants Stancik and SCI knew or should have known that, by alleging that plaintiff committed criminal acts and wrongdoing in the performance of her duties, and by advocating that the Board terminate her employment and never rehire her in any capacity, including as a consultant, she would lose future employment opportunities both within the Board and elsewhere.

181.   Defendants Stancik and SCI sought to interfere with plaintiff's prospective economic opportunities by failing to fully and appropriately investigate the allegations against plaintiff in that they knew or should have known that plaintiff did not commit the criminal and wrongful acts alleged by defendants Stancik and SCI, and yet issuing a report which accused her of criminality and wrongdoing.

182.   Defendants Stancik and SCI acted with the sole purpose of harming plaintiff's future relationship with the Board and with other prospective employers.

183.   By doing so, defendants Stancik, Loughran and SCI caused, and continues to cause, injury to plaintiff's prospective economic relationships.

184.   To date, Stancik, Loughran and SCI continue to interfere with plaintiff's employment relationship by knowingly and intentionally continuing to disseminate false information about plaintiff.

185.   Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

### AND AS FOR A TWELFTH CAUSE OF ACTION
(against defendants Stancik, Loughran and SCI for prima facie tort)

186.   Plaintiff repeats and realleges paragraphs 1 through 185 as though each were fully set forth anew herein.

187.   The issuance of Jailhouse Math and the June 30, 1999 Press Release by Stancik and SCI might be proper if it were based upon a thorough and appropriate investigation. However, defendants issued Jailhouse Math and the June 30, 1999 Press Release and publicly disseminated it with the intent to harm plaintiff and with disinterested malevolence.

188.   To date, Stancik, Loughran and SCI continue to publicly disseminate Jailhouse Math and the June 30, 1999 Press Release.

189.   Plaintiff suffered and continues to suffer, special damages as a result of defendants' wrongful conduct.

190.   Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

27

## AND AS FOR A THIRTEENTH CAUSE OF ACTION

(against defendants Crew, Levy, Vignola, Organisciak, New York City Board of Education, Segarra, Lerner, Cammarata, Thomson, Gresser, Hamer and Thompson for prima facie tort)

191.    Plaintiff repeats and realleges paragraphs 1 through 190 as though each were fully set forth anew herein.

192.    However, defendants preferred charges and continued prosecuting the charges against plaintiff, knowing that probable cause did not exist and with the intent to harm plaintiff and with disinterested malevolence.

193.    Plaintiff suffered special damages as a result of defendants' wrongful conduct.

194.    Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

## AND AS FOR A FOURTEENTH CAUSE OF ACTION

(against defendants Stancik, Loughran and SCI for intentional infliction of emotional distress)

195.    Plaintiffs repeat and reallege paragraphs 1 through 194 as though each were set forth anew herein.

196.    Defendants Stancik's and SCI's conduct in deliberately ignoring existing policies, which demonstrated that their contemplated allegations and conclusions against plaintiff were false and publishing the blatantly false report Jailhouse Math and the June 30, 1999 Press Release constitute extreme and outrageous conduct that transcends the bounds of decency and is utterly intolerable in a civilized society.

197.    Jailhouse Math and the Press Release continue to be publicly disseminated.

198.    Defendants Stancik, Loughran and SCI intended by their conduct to cause, and continue to cause, plaintiff severe emotional distress.

199.    Plaintiff suffered severe emotional distress as a result of an intentional tort perpetrated by or at the direction or instigation of the Board defendants.

200.    Because of defendants' conduct, plaintiff suffered severe emotional distress.

201.    Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

28

## AND AS FOR A FIFTEENTH CAUSE OF ACTION
(against defendants Crew, Levy, Vignola, Organisciak, New York City Board of Education, Segarra, Lerner, Cammarata, Thomson, Gresser, Hamer and Thompson for intentional infliction of emotional distress)

202.     Plaintiffs repeat and reallege paragraphs 1 through 201 as though each were set forth anew herein.

203.     The Board defendants' conduct in deliberately ignoring their own internal investigations that demonstrated that the allegations and conclusions against plaintiff contained in "Jailhouse Math" were false and then blatantly misrepresenting the existence of probable cause to charge plaintiff with criminality and misconduct constitutes extreme and outrageous conduct that transcends the bounds of decency and is utterly intolerable in a civilized society.

204.     Moreover, the Board defendants' conduct in insisting on continuing to press the charges against plaintiff even during the hearing, when none of their witnesses offered any inculpatory evidence against plaintiff but only evidence that was exculpatory, is further extreme and outrageous conduct that transcends the bounds of decency and is utterly intolerable in a civilized society.

205.     The Board defendants intended, by their conduct, to cause plaintiff severe emotional distress.

206.     Plaintiffs suffered severe emotional distress as a result of an intentional tort perpetrated by or at the direction or instigation of the Board defendants.

207.     Plaintiffs suffered severe emotional distress as a result of an intentional tort perpetrated by or at the direction of the Board defendants or instigation.

208.     Because of defendants' conduct, plaintiff suffered severe emotional distress.

209.     Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

## AND AS FOR A SIXTEENTH CAUSE OF ACTION
(against defendants Stancik, Loughran and SCI for negligent infliction of emotional distress)

210.     Plaintiffs repeat and reallege paragraphs 1 through 209 as though each were set forth anew herein.

29

211.    Defendants Stancik and SCI's conduct in recklessly and negligently ignoring facts in their custody and control, or that should have been in their custody and control, demonstrated that their contemplated allegations and conclusions against plaintiff were false and publishing the blatantly false report Jailhouse Math and Press Release constitutes extreme and outrageous conduct that transcends the bounds of decency and is utterly intolerable in a civilized society.

212.    To date, Jailhouse Math and the Press Release continue to be publicly disseminated.

213.    Defendants Stancik, Loughran and SCI intended or recklessly ignored the possibility that, plaintiff would be caused, and would continue to suffer severe emotional distress due to defendants' conduct.

214.    Plaintiffs suffered severe emotional distress as a result of an intentional tort perpetrated by or at the direction of the Board defendants or instigation.

215.    Because of defendants' conduct, plaintiff suffered severe emotional distress.

216.    Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

### AND AS FOR A SEVENTEENTH CAUSE OF ACTION
(against defendants Crew, Levy, Vignola, Organisciak, New York City Board of Education, Segarra, Lerner, Cammarata, Thomson, Gresser, Hamer and Thompson for negligent infliction of emotional distress)

217.    Plaintiffs repeat and reallege paragraphs 1 through 216 as though each were set forth anew herein.

218.    The Board defendants' conduct in recklessly and negligently ignoring their own internal investigations that demonstrated that the allegations and conclusions against plaintiff contained in "Jailhouse Math" were false and then blatantly misrepresenting the existence of probable cause to charge plaintiff with criminality and misconduct constitutes extreme and outrageous conduct that transcends the bounds of decency and is utterly intolerable in a civilized society.

219.    Moreover, the Board defendants' conduct in insisting on continuing to press the charges against plaintiff even during the hearing, when none of their witnesses offered any

inculpatory evidence against plaintiff but only evidence that was exculpatory, is further extreme and outrageous conduct that transcends the bounds of decency and is utterly intolerable in a civilized society.

220.     The Board defendants intended or recklessly ignored the possibility that, by their conduct, plaintiff would suffer severe emotional distress.

221.     Plaintiffs suffered severe emotional distress as a result of an intentional tort perpetrated by or at the direction or instigation of the Board defendants.

222.     Because of defendants' conduct, plaintiff suffered severe emotional distress.

223.     Accordingly, Ms. Jones suffered damages in an amount no less than $20 million.

**AND AS FOR AN EIGHTEENTH CAUSE OF ACTION**
(against defendants SCI and New York City Board of Education for negligent retention and supervision)

224.     Plaintiffs repeat and reallege paragraphs 1 through 223 as though each were set forth anew herein.

225.     Defendants Stancik and Loughran, as well as investigators and others who were involved in the investigation of Ms. Jones and/or prepared, or helped to prepare Jailhouse Math and/or the Press Release, were or are employees of defendant SCI.

226.     Defendants Crew, Levy, Vignola and Organisciak, as well as other employees and counsel who were involved in the investigation and/or prosecution of Ms. Jones, were or are employees of defendant Board.

227.     Defendants SCI and Board owed Ms. Jones a duty to hire employees who were fit for their respective positions.

228.     The employees were unfit for the position because they each, and collectively, failed to perform their duties.

229.     Defendants knew or should have known through the exercise of reasonable diligence that their employees were unfit and dangerous and of their propensity for their conduct that caused injury to Ms. Jones, including but not limited to their failure to conduct a proper

31

investigation, the bringing of charges against Ms. Jones that lacked a factual and legal basis, the reckless disregard for the truth, the malicious and deliberate attempt to deprive Ms. Jones of her employment and the past and continuing smear of Ms. Jones' good name and reputation.

230.   The actions of defendants' employees were perpetrated by or at the direction or instigation of their respective employer.

231.   There was a foreseeable risk of harm to Ms. Jones by the continued retention and lack of supervision of the employees by defendants.

232.   Defendants' negligence in supervising and retaining the employees proximately caused Ms. Jones' damages.

233.   Ms. Jones suffered damages in an amount no less than $20 million.

## AND AS FOR AN NINETEENTH CAUSE OF ACTION
(against defendants Stancik, Loughran, SCI, Crew, Levy, Vignola, Organisciak, New York City Board of Education, Segarra, Lerner, Cammarata, Thomson, Gresser, Hamer and Thompson for loss of consortium)

234.   Plaintiff Steve Bailey repeats and realleges paragraphs 1 through 233 as though each were fully set forth anew herein.

235.   Plaintiff Steve Bailey suffered derivative injuries as a result of his wife's, plaintiff Sharon Jones, injuries attributable and caused by defendants including both tangible and intangible losses.

236.   By reason of defendants' conduct described in the paragraphs above and plaintiff Jones' injuries, plaintiff Steve Bailey has suffered a loss of consortium with his wife and loss of her ability to contribute to the maintenance of their mutual household.

237.   Accordingly, Mr. Bailey suffered damages in an amount no less than $1 million.

**WHEREFORE**, plaintiffs demand the following relief:

(a) A declaratory judgment that defendants violated plaintiff Sharon Jones' constitutionally guaranteed liberty interests;

(b) A declaratory judgment that defendants defamed plaintiff's good name and professional reputation;

(c) Reinstatement to her position as Principal;

(d) Payment for past and future medical treatment in an amount that has not yet been determined, and will be proven at trial, but which is presently estimated at no less than $1,000,000.

(e) Payment for her pain and suffering in an amount that has not yet been determined, and will be proven at trial, but which is presently estimated at no less than $20,000,000.

(f) Payment for lost past and future income, with statutory interest in an amount that has not yet been determined and will be proven at trial, but which is presently estimated at $20,000,000.

(g) Compensatory damages together with statutory interest.

(h) An injunction directing defendants Stancik and SCI to create and issue appropriate standards, policies, practices and guidelines concerning the independent verification of factual and legal allegations prior to the creation and dissemination of any public report and Press Release and to make same public in the public interest of accountability of SCI, and to cease distribution of, and removal from, the SCI Internet site the Press Release and Jailhouse Math report and any further dissemination of the false and defamatory statements against Ms. Jones.

(i) An injunction directing the Chancellor of the New York City Board of Education, the New York City Board of Education and Chad Vignola, as Chief Counsel for the Office of Legal Services for the New York City Board of Education, to create and issue appropriate standards, polices, practices and guidelines concerning the establishment of probable cause for the preferral of

33

charges against tenured teachers and administrators and to make same public in the public interest of accountability of those offices;

(j)   Payment to plaintiff Steve Bailey for loss of consortium in an amount that has not yet been determined, and will be proven at trial, but which is presently estimated at an amount no less than $1,000,000;

(k)   Reasonable attorneys fees, costs and disbursements; and

(l)   Punitive damages for defendants' outrageous and vexatious conduct in an amount no less than $20,000,000.

(m)  Such other and further and different relief as may be just, equitable and proper.

Dated:  New York, New York
        August 15, 2002



                           SHEBITZ BERMAN & COHEN, P.C.




                           By: George Shebitz (6715)
                           800 Third Avenue, 30th Floor
                           New York, NY 10022
                           (212) 832-2797

Of counsel:   Julia R. Cohen (JC 2159)
              Steven S. Landis (SL 8926)

34